**UNICOMP, INC., et al., Plaintiffs,**

v.

**HARCROS PIGMENTS, INC., et al., Defendants.**

No. Civ. 97–55–P–C.

United States District Court, D. Maine.

Feb. 5, 1998.

Peter W. Culley, Geraldine G. Sanchez, Pierce, Atwood, Scribner, Allen Smith & Lancaster, Portland, ME, for plaintiff.

Mary Elizabeth Fougere, Bernstein, Shur, Sawyer & Nelson, Portland, ME, Frederick A. Tecce, H. Bruce Hanson, Eckert, Seamans, Cherin & Mellott, Philadelphia, PA, for defendants Harcros Pigments, Inc.

Daniel R. Mawhinney, Thompson & Bowie, Portland, Maine, for defendant Walsh & Associates Inc.

## MEMORANDUM AND ORDER ON THE RECOMMENDED DECISION OF THE MAGISTRATE JUDGE

GENE CARTER, District Judge.

On October 14, 1997, United States Magistrate Judge Cohen filed with the Court his Recommended Decision regarding the separate Motions to Dismiss pursuant to Fed. R.Civ.P. 12(b)(2) filed by Defendants Harcros Pigments, Inc. ("Harcros") and Walsh & Associates, Inc. ("Walsh") (Docket No. 26). The Magistrate Judge recommended that the Court deny both Defendants' Motions to Dismiss. The Recommended Decision of the Magistrate Judge, setting forth the facts and the legal framework for the exercise of personal jurisdiction, is appended to this Memorandum and Order as "Exhibit A." Harcros and Walsh each filed Objections to the Magistrate Judge's Recommended Decision (Docket Nos. 28 and 27), requesting *de novo* review of the Magistrate Judge's Recommended Decision and findings pursuant to 28 U.S.C. § 636(b)(1), and Plaintiffs UniComp, Inc. ("UniComp") and Unico, Inc. ("Unico") responded to Defendants' Objections (Docket Nos. 29 and 30).

The Court has reviewed and considered the Magistrate Judge's Recommended Decision as well as the entire record. The Court has made a *de novo* determination of the matters adjudicated by the Magistrate Judge and concurs with the Magistrate Judge's recommendations. The Court will address the objections of the Defendants separately.

### A. HARCROS'S OBJECTIONS

■ Harcros initially objects to the Magistrate Judge's determination that the relatedness requirement is uncontested.[1] *See* Recommended Decision at 7; Defendant Harcros's Objection to the Recommended Decision at 2 n. 1. Harcros argues that its contacts are limited to "after-the-fact" contacts, and thus, they are not related to and do not give rise to Plaintiffs' claims. *See* Harcros's Reply Memorandum (Docket No. 20) at 4. In *Nowak v. Tak How Investments, Ltd.,* 94 F.3d 708 (1st Cir.1996), *cert. denied,* — U.S. —, 117 S.Ct. 1333, 137 L.Ed.2d 493 (1997), the Court of Appeals for the First Circuit explained that the relatedness requirement is one of proximate cause, albeit applied with a flexible, relaxed approach. *Nowak,* 94 F.3d at 715. The Court's assessment of relatedness is informed by the concept of foreseeability. *Id.* The Court determines that an alleged injury from the sale of a product in a forum targeted by the manufacturer through its choice of

---

1. As the Recommended Decision explains, there are three requirements for the exercise of specific jurisdiction: relatedness, purposeful availment, and reasonableness. *See* Recommended Decision at 2 (quoting *Nowak v. Tak How Invs., Ltd.,* 94 F.3d 708, 712–13 (1st Cir.1996), *cert. denied,* — U.S. —, 117 S.Ct. 1333, 137 L.Ed.2d 493 (1997)).

distributors is sufficiently foreseeable to satisfy the relatedness prong of the jurisdictional inquiry. The Court further notes that neither the Supreme Court nor the Court of Appeals for the First Circuit has expressed concern about the causal link in cases analyzing the stream-of-commerce theory of personal jurisdiction. *See, e.g., Asahi Metal Industry Co. v. Superior Court of California,* 480 U.S. 102, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987); *Boit v. Gar–Tec Products, Inc.,* 967 F.2d 671 (1st Cir.1992). Rather, in these cases, the jurisdictional hitch comes from the requirement of purposeful availment.

Harcros objects to the Magistrate Judge's finding of purposeful availment. In *Asahi Metal Industry Co. v. Superior Court of California,* 480 U.S. 102, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987), Justice O'Connor, writing on behalf of a plurality of the Supreme Court, stated:

> The placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State. Additional conduct of the defendant may indicate an intent or purpose to serve the market in the forum State, for example, designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State.

*Asahi,* 480 U.S. at 112, 107 S.Ct. 1026, 94 L.Ed.2d 92. The Court of Appeals for the

First Circuit adopted the plurality's position in *Boit v. Gar–Tec Products, Inc.,* 967 F.2d 671 (1st Cir.1992), in which it indicated that personal jurisdiction would not exist over the defendant because " 'mere awareness' that a product may end up in the forum state does not constitute 'purposeful availment.' " [2] *Boit,* 967 F.2d at 683. In rejecting the plaintiffs' stream-of-commerce theory, the court specifically stated that "[t]here is no evidence in the record that [the defendant] intended to serve the market in Maine." *Id.* To support its conclusion, the *Boit* court reiterated the *Asahi* examples of "additional conduct" and concluded that the record did not provide evidence of those types of conduct. *Id.*

In the instant case, the Magistrate Judge found evidence of two of the examples offered by the Court of Appeals for the First Circuit as "additional conduct" indicative of the minimum contacts necessary to support a finding of personal jurisdiction. First, Harcros has established a national customer service "800" telephone number for technical advice. The Magistrate Judge determined that, through this number, Harcros "made its technical advisors available to the plaintiffs in Maine." Recommended Decision at 8. The Court concludes that the mere maintenance of an "800" telephone number is not sufficiently directed at the State of Maine to constitute additional conduct evincing "an intent or purpose to serve the market in the forum State." [3] *Asahi,* 480 U.S. at 112, 107 S.Ct. 1026, 94 L.Ed.2d 92.

Second, the Magistrate Judge found that Harcros has "used its distribution net-

---

2. In adopting the plurality's position in *Boit,* the court discussed *Dalmau Rodriguez v. Hughes Aircraft Co.,* 781 F.2d 9 (1st Cir.1986), in which it had previously addressed and rejected the stream-of-commerce theory of personal jurisdiction. *Boit,* 967 F.2d at 682. In *Dalmau Rodriguez,* the court found that the sale of two helicopter through a distributor did not give rise to personal jurisdiction over the manufacturer, even though a technician and a sales representative employed by the manufacturer had visited the forum on its behalf. *Dalmau Rodriguez,* 781 F.2d at 14–15. Harcros argues that *Dalmau Rodriguez* is controlling precedent for this case, and it asserts that its contacts are even less substantial than those of the defendant in *Dalmau Rodriguez.* The Court notes that *Dalmau Rodriguez,* while still relevant for its rejection of

the stream-of-commerce theory, is not helpful in applying *Asahi* 's additional conduct analysis because *Dalmau Rodriguez* was decided prior to the Supreme Court's decision in *Asahi.*

3. Plaintiffs assert that the telephone calls placed to Harcros after the discovery of the allegedly defective pigment should be construed as evidence that the 800 telephone number is directed at Maine. However, the Court of Appeals for the First Circuit has indicated that contacts made after the cause of action arises do not impact the jurisdictional analysis. *See Bond Leather Co. v. Q.T. Shoe Mfg. Co.,* 764 F.2d 928, 932 n. 2 (1st Cir.1985); *Whittaker Corp. v. United Aircraft Corp.,* 482 F.2d 1079, 1082 n. 3 (1st Cir.1973).

work to service the plaintiffs in Maine." Recommended Decision at 8. The record reveals that New England Resins, along with several other distributors located in the New England and mid-Atlantic regions, carried Harcros products. Deposition of Ellen Murphy ("Murphy Dep.") at 45–46; Deposition of Henry C. Reyna ("Reyna Dep.") at 14; Deposition of William Gurley ("Gurley Dep.") at 55–56. The record further indicates that Harcros was aware that its distributors' sales territories included Maine. Deposition of Mark D. Loudenslager ("Loudenslager Dep.") at 20, 67; Gurley Dep. at 37. Harcros has established a distribution network that includes distributors who target Maine as part of their sales territories. Loudenslager Dep. at 27. The arrangement with New England Resins is the sort of conduct that "may indicate an *intent or purpose* to serve the market in the forum State". *Asahi*, 480 U.S. at 112, 107 S.Ct. 1026, 94 L.Ed.2d 92 (emphasis added). By arranging to have a distributor, if not several of them, whose sales territory will include the forum state, a manufacturer evinces at the very least an *intent* to serve the market in the forum state. Further, the record indicates that New England Resins did, in fact, attempt to serve the market for Harcros products in Maine by contacting Plaintiffs in 1991.[4] Gurley Dep. at 22. Harcros promotional materials and samples were sent to Plaintiffs in early 1991. Gurley Dep. at 23, 30. Although New England Resins was unsuccessful in soliciting Plaintiffs' business, *id.* at 35, the attempt is still relevant for jurisdictional purposes.[5] It further indicates that Harcros sold its products to distributors who would at least attempt to resell the products in Maine. This demonstrates an *intent* to serve the market for pigments in Maine.

The function of the purposeful availment requirement is to ensure that a nonresident defendant is not haled into the forum based upon "'random, isolated, or fortuitous' contacts with the forum state." *Sawtelle v. Farrell*, 70 F.3d 1381, 1391 (1st Cir.1995) (citing *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984)). The Court sees nothing random, isolated, or fortuitous about a manufacturer's relationships with distributors whose sales territories include the forum state.[6] Such an

4. As explained previously, the Court does not consider contacts made after the cause of action arose. Therefore, the Court does not take notice of New England Resins's attempts to solicit business from Plaintiffs in 1996. *See infra* at n. 3.

5. Harcros argues that the 1991 solicitation is irrelevant because it involved iron oxides rather than the burnt umber pigment at issue in this case. The Court is not persuaded that this distinction bears on Harcros's intent to serve the Maine market for its products.

6. The purposefulness requirement is informed by considerations of voluntariness and foreseeability. *See Nowak*, 94 F.3d at 716. At oral argument, Harcros correctly pointed out that the voluntariness inquiry "ensures that the defendant's contacts with the forum state are not based on 'the unilateral actions of another party or a third person.'" *Scott v. Robert Trent Jones II*, 984 F.Supp. 37, 44 (D.Me.1997) (quoting *Nowak*, 94 F.3d at 716). Harcros objects to the Magistrate Judge's consideration of New England Resins's contacts with Maine as well as its contacts with Plaintiffs and encourages the Court not to attribute to it the conduct of New England Resins. *Asahi*, however, explicitly contemplates consideration of manufacturers' relationships with distributors in the jurisdictional inquiry. *Asahi*, 480 U.S. at 112, 107 S.Ct. 1026, 94 L.Ed.2d 92. Such a relationship may indicate an

intent to serve the market in the forum state, *id*, and thus, any contact with the forum state made in the furtherance of such a relationship cannot be considered to be "unilateral" on the part of the distributor.

Harcros argues that the language of *Asahi* should be construed to require both intent to serve the market in the forum state *and* conduct in the forum state. Harcros asserts that its relationship with New England Resins does not satisfy the criteria for additional contacts set forth in *Asahi* because Harcros has not appointed a sales agent *in* Maine. The Court is not persuaded that *Asahi* requires a distributor to be located in the forum state in order to infer an intent to serve the market in the forum state. It is the relationship between Harcros and New England Resins, as well as New England Resins's corresponding role as Harcros's distributor in Maine (as part of its sales territory), that satisfies the additional contacts requirement articulated in *Asahi*. *See Asahi*, 480 U.S. at 112 (indicating that a relationship with a distributor "who has agreed to serve as the sales agent in the forum State" is the type of additional conduct necessary for a finding of purposeful availment). The Court is unwilling to draw a distinction between appointing a sales agent with offices in Maine and a sales agent whose sales territory includes Maine. With either appointment, the manufacturer is ensuring that the market for its products in Maine will be served, and such a result is foreseeable.

**28**

arrangement allows the manufacturer to assume that the forum state's market for its product will be served. When a manufacturer makes the effort to select distributors who will target Maine as part of their sales territories, the manufacturer's contacts with Maine are not random or fortuitous, but instead, the result of a conscious and deliberate decision to serve the market here.

Harcros points out that Plaintiffs did not purchase the pigments in question from any of the New England distributors who carried Harcros products but, rather, purchased the pigments from Walsh, a Missouri corporation. Murphy Dep. at 49. The Court acknowledges this interesting factual twist, but it does not negate Harcros's additional conduct evincing an intent or purpose to serve Maine's market for pigments. The Court is satisfied that *Asahi*'s application to these facts does not thwart the First Circuit's explicit rejection of the stream-of-commerce theory. Harcros has not merely placed its pigments into the stream of commerce. Rather, it has carefully and knowingly chosen distributors located in this region whose sales territories include Maine. In doing so, it has indicated the requisite intent or purpose to serve the market in Maine and, thus, has purposefully availed itself of this forum.

## B. WALSH'S OBJECTIONS

The application of the three-prong test for specific jurisdiction to the jurisdictional facts alleged by Plaintiffs indicates that this Court properly exercises personal jurisdiction over Walsh in this matter. Walsh raises several objections to the Magistrate Judge's Recommended Decision.

■ First, Walsh protests the Magistrate Judge's conclusion that it has purposefully availed itself of the Maine forum. Walsh points out that it did not solicit Plaintiffs' business but merely responded to Plaintiffs' unsolicited orders. This argument, however, is substantially weakened by the course of

dealing between Walsh and Plaintiffs. Walsh did not reject Plaintiffs' orders and, in fact, continued to provide Plaintiffs with Harcros products over the course of five years. Murphy Dep. at 48–49. Walsh further asserts that Plaintiffs accepted delivery of the pigments in Missouri. However, the fact that title to the shipments passed in Missouri is not determinative. *See Benitez–Allende v. Alcan Aluminio do Brasil, S.A.,* 857 F.2d 26, 30 (1st Cir.1988) (rejecting such an argument as insignificant to the jurisdictional analysis). Walsh directed seventeen shipments to Plaintiffs in Maine over the course of five years. Murphy Dep. at 49. The record indicates that Walsh knew that Plaintiffs were located in Maine and communicated with Plaintiffs by telephone and mail regarding each shipment. Murphy Dep. at 11–12. Walsh considered Plaintiffs to be customers. Murphy Dep. at 39. This course of conduct is sufficient to support a finding of purposeful availment on the part of Walsh.[7] *See Coolidge v. Judith Gap Lumber Co.,* 808 F.Supp. 889, 892 (D.Me.1992) (finding that "knowingly accepting an order to ship lumber here, choosing and packing a boxcar, and making such delivery to Maine by rail" constitutes purposeful availment).

■ Walsh also argues that the Magistrate Judge erred in concluding that the First Circuit's gestalt factors do not counsel against dismissal. The Court finds the Magistrate Judge's conclusion to be correct. The gestalt factors, used to evaluate the reasonableness of exercising personal jurisdiction over nonresident defendants, include:

(1) the defendant's burden of appearing, (2) the forum state's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the judicial system's interest in obtaining the most effective resolution of the controversy, and (5) the common interests

---

7. Walsh relies on *Banton Industries, Inc. v. Dimatic Die & Tool Co.,* 801 F.2d 1283 (11th Cir. 1986). In *Banton,* the court based its decision in part on the fact that the goods were tendered in a different state. *Banton,* 801 F.2d at 1284. As noted previously, the First Circuit does not find this factor determinative. Further, the Court

declines to follow the Eleventh Circuit case law in favor of the case law established by this Court which indicates that Walsh's contacts are sufficient for purposeful availment. *See Coolidge v. Judith Gap Lumber Co.,* 808 F.Supp. 889 (D.Me. 1992).

of all sovereigns in promoting substantive social policies.

*Nowak,* 94 F.3d at 717 (citations omitted). Walsh bears the burden of demonstrating that the gestalt factors militate against the exercise of jurisdiction. *See Coolidge,* 808 F.Supp. at 891. In objecting to the Magistrate Judge's conclusion, Walsh focuses solely upon the first gestalt factor and argues that because it is a small, foreign corporation, it would be unfair to subject it to personal jurisdiction in Maine. Defendant Walsh's Objection to the Magistrate Judge's Recommended Decision at 6–7. The Court notes that a defendant must allege something "beyond the ordinary cost and inconvenience of defending an action so far from its place of business." *Nowak,* 94 F.3d at 718. Walsh's size and the corresponding burden of foreign litigation does not outweigh the sum of Maine's interest in resolving the dispute and Plaintiffs' interest in obtaining convenient and effective relief. Maine has an interest in adjudicating this dispute, as the injury occurred in this forum. *See Ticketmaster–New York, Inc. v. Alioto,* 26 F.3d 201, 211 (1st Cir.1994). Plaintiffs' interest weighs in favor of a Maine forum, as Plaintiffs are Maine corporations of similar size to Walsh. Affidavit of Irving Quimby (Docket No. 24) ¶ 9 (Plaintiffs have two offices and 80–120 employees); Murphy Dep. at 42 (Walsh has seven offices and 52 employees). Further, two of the shoe companies to whom Plaintiffs sold the allegedly defective shoe soles are Maine companies, thus indicating that a number of potential witnesses are located in Maine. Affidavit of Robert L. Morin (Docket No. 22) ¶ 10. The Court concurs with the Magistrate Judge in concluding that Walsh has not demonstrated that the gestalt factors compel dismissal.

### CONCLUSION

The Court accepts Magistrate Judge Cohen's decisions on Defendants' Motions to Dismiss. Accordingly, it is **ORDERED** that Defendant Harcros's Motion to Dismiss be, and it is hereby, **DENIED** . Further, it is **ORDERED** that Defendant Walsh's Motion to Dismiss be, and it is hereby, **DENIED.**

### EXHIBIT A

### *RECOMMENDED DECISION ON DEFENDANTS' MOTIONS TO DISMISS FOR LACK OF PERSONAL JURISDICTION*

DAVID M. COHEN, United States Magistrate Judge.

Invoking the court's diversity jurisdiction, the plaintiffs assert claims for breach of warranty and negligence in connection with pigments, purchased by the plaintiffs for use in manufacturing shoe soles and other rubber products, which the plaintiffs contend were defective. Each of the two defendants has separately moved pursuant to Fed.R.Civ.P. 12(b)(2) to dismiss the action as against it for lack of personal jurisdiction. For the reasons that follow, I recommend that both motions be denied.

#### I. Legal Context

A court's personal jurisdiction over a defendant must be premised on one of two theories: specific or general jurisdiction. *Foster–Miller, Inc. v. Babcock & Wilcox Canada,* 46 F.3d 138, 144 (1st Cir.1995). "General jurisdiction exists when the litigation is not directly founded on the defendant's forum-based contacts, but the defendant has nevertheless engaged in continuous and systematic activity, unrelated to the suit, in the forum state." *Id.* (citation and internal quotation marks omitted). The plaintiffs in this case do not contend that principles of general jurisdiction are applicable. Therefore, "the lens of judicial inquiry narrows to focus on specific jurisdiction," which "requires weighing the legal sufficiency of a specific set of interactions as a basis for personal jurisdiction." *Id.* (citation omitted). In so doing, the court applies the long-arm statute of the forum state. *Nowak v.. Tak How Invs., Ltd.,* 94 F.3d 708, 712 (1st Cir. 1996) (citation omitted), *cert. denied,* — U.S. ——, 117 S.Ct. 1333, 137 L.Ed.2d 493 (1997). Maine's long-arm statute, 14 M.R.S.A. § 704–A, expressly directs courts to construe it in a manner that creates personal jurisdiction to the fullest extent permitted by the due process requirements of the federal Constitution. *Boit v. Gar–Tec Prods., Inc.,* 967

F.2d 671, 679 (1st Cir.1992) (citations omitted).

"[W]hen a state's long-arm statute is coextensive with the outer limits of due process, the court's attention properly turns to the issue of whether the exercise of personal jurisdiction comports with federal constitutional standards." *Sawtelle v. Farrell*, 70 F.3d 1381, 1388 (1st Cir .1995) (citation omitted). The requisite inquiry proceeds in three stages:

> First, the claim underlying the litigation must directly arise out of, or relate to, the defendant's forum-state activities. Second, the defendant's forum-state contacts must represent a purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of that state's law's and making the defendant's involuntary presence before the state's court foreseeable. Third, the exercise of jurisdiction must, in light of the Gestalt factors, be reasonable.

*Nowak*, 94 F.3d at 712–13 (quoting *United Elec. Workers v. 163 Pleasant St. Corp.*, 960 F.2d 1080, 1089 (1st Cir.1992)) (other citations omitted). The gestalt factors are elucidated *infra.*

When a defendant seeks dismissal under Rule 12(b)(2), the burden is on the plaintiff to demonstrate the existence of *in personam* jurisdiction. *Boit*, 967 F.2d at 674–75 (citations omitted). If the relevant facts are essentially undisputed, it is appropriate for the court to employ a prima facie standard in evaluating the dismissal motion, rather than embarking on a more elaborate adjudicatory process. *Nowak*, 94 F.3d at 712. In such a case, the court's role is similar to the posture it would adopt in a summary judgment proceeding, accepting the plaintiff's properly documented factual assertions as true for purposes of determining whether the case should proceed to trial.[1] *Foster–Miller*, 46 F.3d at 145. In this instance, although the plaintiffs vigorously contest the legal significance of the jurisdictionally relevant facts adduced by the parties in their respective motion papers, the facts themselves are not in dispute. Therefore, this is an appropriate case for application of the prima facie standard.

## II. Factual Background

In light of the foregoing, the record developed in connection with the pending motions reveals the following: The complaint alleges that the plaintiffs are both Maine corporations doing business in Sanford, Maine. Complaint (Docket No. 1) at ¶ 2–3. Plaintiff UniComp, Inc. ("UniComp") manufactures "thermoplastic" rubber compound. *Id.* at ¶ 2. Plaintiff Unico, Inc. ("Unico") uses thermoplastic rubber compound to manufacture shoe soles. *Id.* at ¶ 3.

Defendant Harcros Pigments, Inc. ("Harcros") is an Illinois corporation with its principal place of business in that jurisdiction. *Id* at 4; Memorandum in Support of Motion of Defendant Harcros Pigments, Inc. to Dismiss, etc. ("Harcros Memorandum") (Docket No. 4) at 3. Defendant Walsh & Associates, Inc. ("Walsh") is a Missouri corporation that maintains a place of business in St. Louis, Missouri. Affidavit of Timothy T. Walsh ("Walsh Aff.") (Docket No. 14) at ¶¶ 3–4. Neither company maintains a place of business in Maine, or has any employees or agents in Maine. *Id.* at ¶¶ 7–8; Affidavit of Mark Loudenslager ("Loudenslager Aff."), Exh. B to Harcros Memorandum, at ¶¶ 8–9. The plaintiffs allege in their complaint that a quantity of "BU 5250F burnt umber" pigment, manufactured by Harcros or its predecessor-in-interest and sold to the plaintiffs by Walsh, was defective and therefore caused injury to the plaintiffs. Complaint at ¶¶ 8–10. The complaint asserts claims for breach of express and implied warranties against both defendants and a claim for negligence against Harcros. *Id.* at ¶¶ 13–21.

Harcros does not have any customers in Maine to whom it sells products directly, nor does it purchase any raw materials from sources in Maine. Loudenslager Aff. at ¶¶ 4, 7. However, Harcros maintains what its literature describes as a "worldwide distribution network," which includes both Walsh and an

---

**1.** When the court applies the prima facie standard and denies a dismissal motion, it is not finally resolving the jurisdictional challenge but is instead deferring the issue to trial. *Boit*, 967 F.2d at 676, citing Fed.R.Civ.P. 12(d).

entity known as New England Resins & Pigments ("New England Resins"). Deposition of Mark D. Loudenslager ("Loudenslager Dep.") at 27. Walsh's sales territory includes the midwest as well as Utah, Wyoming and parts of New Mexico, Idaho and Tennessee. Deposition of Ellen Murphy ("Murphy Dep.") at 44. Walsh does not solicit business anywhere on the eastern seaboard. *Id.*

By contrast, the sales territory of New England Resins is the six New England States. Loudenslager Dep. at 20. Henry Reyna, a sales representative employed by Harcros, visits New England Resins approximately four times a year to ascertain whether the distributor is in need of any "technical support" from Harcros. Deposition of Henry C. Reyna ("Reyna Dep.") at 15. Representatives of New England Resins & Pigments contacted Unico by telephone and in person during 1991 and 1996 in an effort to sell the plaintiffs Harcros pigments. Deposition of William Gurley ("Gurley Dep.") at 11–12, 22 and Exh. 2 thereto. The internal forms generated by New England pigments concerning the 1991 contacts with the plaintiffs refer to Harcros as the "principal." Exh. 2 to Gurley Dep., *seriatim*. Harcros provides promotional literature to the distributors for their use in marking Harcros products. Reyna Dep. at 19. When technical advice about a Harcros product is required, the distributors pass such requests directly on to Harcros. *Id.* at 17–18. Harcros also maintains a toll-free "800" number, contained in the promotional literature it provides to its distributors for dissemination to customers, through which customers contact Harcros directly for service and technical assistance. Murphy Dep. at 26; Exh. 5 to Gurley Dep. at B–44.

Contact between Walsh and the plaintiffs' predecessor-in-interest traces to 1976. In that year, a concern known as United Shoe Machinery began purchasing Pfizer Pigments, Inc. products from Walsh. Affidavit

of Irving Quimby "(Quimby Aff.") (Docket No. 24) at ¶ 3.[2] United Shoe Machinery transferred its operations to Sanford, Maine in 1984 and was purchased by Unico the following year. *Id.* at ¶ 4. Unico continued to purchase pigments from Walsh. *Id.* When Harcros purchased the part of Pfizer's business that manufactured the pigments used by the plaintiffs, the plaintiffs began ordering Harcros pigments from Walsh instead of Pfizer. *Id.* at ¶ 7. In 1989 Unico contacted Walsh and requested 100 pounds of Harcros burnt umber pigment. Murphy Dep. at 45. Although Walsh referred Unico to New England Resins, *id.*, Unico ultimately ordered the pigment from Walsh.[3] Between October 1991 and December 1996, Walsh made 17 separate shipments of Harcros pigments to the plaintiffs in Maine. Murphy Dep. at 49. In each of these transactions, the plaintiffs selected the carrier but it was Walsh that made the arrangements with the carrier. *Id.* at 16. On all occasions when the plaintiffs purchased chemicals from Walsh, the shipments were made F.O.B. St. Louis and the plaintiffs took title to the material at Walsh's place of business in that city. Walsh Aff. at ¶ 10. During this period, Walsh considered the plaintiffs to be a "house account" (meaning no specific salesperson had responsibility for the account) but definitely a Walsh customer. Murphy Dep. at 39, 41. Walsh has not sold any chemical products to customers in Maine other than the plaintiffs. Walsh Aff at ¶ 4.

In approximately January 1995 the plaintiffs began receiving complaints that the shoe soles they had manufactured using the pigment at issue in this litigation were becoming embrittled and were cracking. Affidavit of Robert L. Morin ("Morin Aff.") (Docket No. 22) at ¶ 4. After conducting tests, the plaintiffs determined that the Harcros pigment was the cause of the problem. *Id.* at ¶ 5. Peter Goguen telephoned Mark Loudenslager, the technical services manager at Harcros, to discuss the problem. *Id* . at ¶ 7.[4]

---

**2.** Quimby made this assertion only on information and belief. However, Walsh explicitly concedes that the relationship between it and the plaintiffs began in this manner.

**3.** The Walsh Deposition does not appear to establish that Walsh filled this order, but Walsh so asserts in its motion and the plaintiffs do not dispute the contention.

**4.** Morin, the plaintiff's manufacturing manager,

Loudenslager did not refer Goguen to Walsh. Loudenslager Dep. at 40–41. Instead, he provided Goguen with certain technical data developed at Harcros in an effort to assist the plaintiffs in correcting the problem by switching to a different pigment. *Id.* at 40. He also suggested, by letter dated August 23, 1995, that UniComp switch from the burnt umber pigment to other pigments not containing certain specified chemicals. Exh. 2 to Laudenslager Dep. at C–2 to C–3. The Harcros sales manager wrote to UniComp in March 1996 to indicate that Harcros was addressing the problem and that a "[s]ales [r]epresentative would be contacting [Uni-Comp] if further follow-up is required." *Id.* at C–14.

### III. Purposeful Availment

In seeking dismissal for lack of personal jurisdiction, Harcros does not contend that the plaintiff's claims fail to arise out of its activities in the forum state. Rather, Harcros moves directly to the second stage of the inquiry and takes the position that its contacts with the forum state did not constitute a purposeful availment of the privilege of conducting activities within its borders.

In *Asahi Metal Indus. Co. v. Superior Court of California*, 480 U.S. 102, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987), a plurality of the Supreme Court expressed the view that a defendant does not purposefully avail itself of the privilege of conducting activities in the forum state simply by placing a product into the stream of commerce, even when that stream ultimately leads to the forum state. *Id.* at 112, 480 U.S. 102, 107 S.Ct. 1026, 94 L.Ed.2d 92 (O'Connor, J.) (plurality opinion). The First Circuit embraced this view in *Boit*, reaffirming an earlier holding that the "stream of commerce" theory will not support a finding of purposeful availment even if the defendant knew that the item or items at issue would ultimately end up in the forum state. *Boit*, 967 F.2d at 682–683 (citations

omitted). "The test is not knowledge of the ultimate destination of the product, but whether the manufacturer has purposefully engaged in forum activities so it can reasonably expect to be haled into court there." *Id.* (quoting *Dalmau Rodriguez v. Hughes Aircraft Co.*, 781 F.2d 9, 15 (1st Cir.1986)).

However, as the *Asahi* plurality noted, "[a]dditional conduct of the defendant may indicate an intent or purpose to serve the market in the forum State, for example . . . establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who had agreed to serve as sales agent in the forum State." *Asahi*, 480 U.S. at 112, 107 S.Ct. 1026, 94 L.Ed.2d 92. As the plaintiffs point out, they have made at least a prima facie showing that this is precisely such a case. The only glitch here is that New England Resins & Pigments agreed to be the Harcros agent for serving Maine and the rest of New England, whereas Walsh was actually the distributor who sold the products to the plaintiffs in Maine. That, of course, is a function of the course of dealing that arose between the parties to the transactions in question and their predecessors. I am not aware of any sense in which it alters the calculus on the issue of purposeful availment. Harcros used its distribution network to service the plaintiffs in Maine and likewise made its technical advisors available to the plaintiffs in Maine. This is the sort of additional conduct described by the *Asahi* plurality that renders it reasonable to hale Harcros into a Maine court. *See, e.g., Logan Prods., Inc. v. Optibase, Inc.*, 103 F.3d 49, 53 (7th Cir.1996) (defendant sold product in forum through distributor and "not some little mom and pop retailer who passively sold only to those out-of-staters who happened to wander into its shop"); *Kuenzle v. HTM Sport–Und Freizeitgerate AG*, 102 F.3d 453, 458 (10th Cir. 1996) ("The actions of an independent distributor may not insulate a foreign company from *specific* jurisdiction.") (emphasis in

actually states in his affidavit that Goguen, whom he does not identify, contacted Loudenslager. Morin Aff. at ¶¶ 1, 7. Morin makes this assertion only "[u]pon information and belief" *Id.* at ¶ 7. The plaintiffs identify Goguen as their "Research and Development Manager." Plaintiffs' Opposi-

tion to Defendant Harcros Pigments, Inc.'s Motion, etc. (Docket No. 18) at 4. The parties do not appear to be in dispute over the contact that occurred between employees of the plaintiffs and employees of Harcros once the plaintiffs had determined the resin to be defective.

original); *Barone v. Rich Bros. Interstate Display Fireworks Co.*, 25 F.3d 610, 613, 615 (8th Cir.1994) (jurisdiction over manufacturer appropriate in face of its "willful" ignorance of its distributor's sales in forum state); *Tobin v. Astra Pharm. Prods., Inc.*, 993 F.2d 528, 543–44 (6th Cir.1993) (seeking distributors who would market product in each state constitutes the "something more" described in *Asahi* ).

It obviously follows that the court should also reject the similar contention of Walsh that it did not purposefully avail itself of the privilege of doing business in Maine. In so asserting, Walsh relies principally on the Eleventh Circuit's opinion in *Banton Indus., Inc. v. Dimatic Die & Tool Co.*, 801 F.2d 1283 (11th Cir.1986), in which a divided panel held that one sale of goods to a customer in the forum state did not constitute purposeful availment. *Id.* at 1284. The present case is distinguishable. As noted, *supra*, the relationship between Walsh and the plaintiffs grew out of contacts between Walsh and the plaintiffs' predecessor-in-interest, but the business relationship endured through United Shoe Machinery's move to Maine in 1984 and its subsequent takeover by Unico. Even after Walsh attempted thereafter to divert Unico to the Harcros distributor whose territory included Maine, Walsh made numerous sales to the plaintiffs. Therefore, it cannot be said that the assertion of personal jurisdiction is "premised solely upon [Walsh's] random, isolated, or fortuitous contacts with the forum state." *Sawtelle*, 70 F.3d at 1391 (citation and internal quotation marks omitted).

## IV. The Gestalt Factors

The remaining inquiry relates to the so-called gesalt factors. Designed to assure that personal jurisdiction is exercised only within the dictates of "fair play and substantial justice," the gestalt factors are:

(1) the defendant's burden of appearing, (2) the forum state's interest in adjudicating the dispute, (2) the plaintiff's interest in obtaining convenient and effective relief, (4) the judicial system's interest in obtaining the most effective resolution of the controversy, and (5) the common interests of all sovereigns in promoting substantive social policies.

*Nowak*, 94 F.3d at 717 (citations omitted). The term "gestalt factors" refers to the principle that, in any given case, the factors "may neither be amenable to mechanical application nor be capable of producing an open-and-shut result. Their primary function is simply to illuminate the equitable dimensions of a specific situation." *Foster–Miller*, 46 F.3d at 150. At this stage of the analysis, the burden shifts to the defendant to convince the court that the gestalt factors militate against the exercise of jurisdiction. *Coolidge v. Judith Gap Lumber Co.*, 808 F.Supp. 889, 891 (D.Me.1992); *see also Foster–Miller*, 46 F.3d at 145 (plaintiff "must carry the devoir of persuasion on the elements of relatedness and minimum contacts") (citations omitted).

In my opinion, neither defendant has carried its burden of persuasion concerning the gestalt factors. Harcros contends in a conclusory manner that it would be burdensome to require an Illinois corporation to litigate in Maine. That self-evident assertion, without more, is insufficient to raise any significant issue as to the first gestalt factor. *See Nowak*, 94 F.3d at 718 (for this factor to assume significance, defendant must allege something "beyond the ordinary cost and inconvenience of defending an action so far from its place of business"). Next, addressing the second gestalt factor, Harcros suggests that Maine has no interest in adjudicating the dispute because none of the acts or omissions complained of took place in Maine. While that may attenuate the forum state's interest, the fact that injury occurred within the forum state means the interest is still demonstrable. *See Ticketmaster–New York, Inc. v. Alioto*, 26 F.3d 201, 211 (1st Cir.1994). Finally, and apparently addressing the final gestalt factor, Harcros warns of a chilling effect on commerce if jurisdiction is exercised here because such a determination would imply that all manufacturers must be prepared to defend themselves in any forum. The case law belies this hyperbolic assessment, which requires no further discussion. Walsh does not specifically address the gestalt factors beyond suggesting that, if the court declines to exercise jurisdiction over

Harcros it should certainly take the same approach to the much-smaller Walsh. Therefore, I am satisfied that requiring either defendant to litigate this case in Maine would be fully consistent with notions of fair play and substantial justice.

## V. Conclusion

For the foregoing reasons, I recommend that the defendants' motions for dismissal of the action pursuant to Rule 12(b)(2) be **DENIED.**

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum, within ten (10) days after being served with a copy thereof. A responsive memorandum shall be filed within ten (10) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

*Dated this 14th day of October, 1997.*